# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 15, 2002 Session

## RONALD C. MEREDITH, JR., ET AL. v. JAMES F. STAIR

### Appeal from the Circuit Court for Anderson County
### No. 96LA0543    James B. Scott, Jr., Judge

### FILED MAY 10, 2002

### No. E2001-02852-COA-R3-CV

In this suit seeking damages for breach of contract, Ronald C. Meredith, Jr., and Clinton Broadcasters, Inc., were granted a judgment against James F. Stair in the amount of $84,326. Mr. Stair appeals. His single issue insists that the Trial Court was in error in finding a breach of contract. We disagree and affirm.[1]

### Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Cause Remanded

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Dail R. Cantrell, Clinton, Tennessee, for the Appellant, James F. Stair

C. Mark Troutman, LaFollette, Tennessee, for the Appellees, Ronald C. Meredith, Jr., and Clinton Broadcasters, Inc.

### OPINION

This is a suit wherein Ronald C. Meredith, Jr., and Clinton Broadcasters, Inc.,[2] sue James F. Stair for breach of a contract by which Mr. Meredith purchased all of the stock of Clinton Broadcasting, Inc., which owned and operated an AM radio station-WYSH in Clinton.

---

[1]     Oral argument was heard in this case on April 15, 2002, at Knoxville Catholic High School, as part of this Court's C.A.S.E. (Court of Appeals Affecting Student Education) project.

[2]     Mr. Meredith's wife, Denise, was a 50 percent owner of Clinton Broadcasters' stock, but was not a party Plaintiff in this case.

The Trial Court found that the evidence preponderated in favor of the Plaintiffs' position and awarded damages against Mr. Stair in the amount of $84,326.

Mr. Stair appeals, asserting as his only issue the following:

## STATEMENT OF THE ISSUE

I.      Whether the trial court erred in holding that the Appellant had breached the contract that is the subject matter of this litigation.

Much of the proof is in sharp conflict. Mr. Meredith insists that prior to signing the contract of purchase he only looked at the radio station and the property upon which it was situated briefly in December 1990. Thereafter, upon returning to Arizona where he had been living, he and Mr. Stair negotiated by phone a purchase price, according to the stock purchase agreement, of $138,749.20. The contract for sale was dated April 19, 1991, and was included in the application to the Federal Communications Commission seeking a transfer of the license to broadcast.

A few days thereafter, according to Mr. Meredith, he learned that two of the four towers which serve the station were located on the property of a neighbor, Betty Hendrickson. He was, however, assured by Mr. Stair that the owner of the property where these two towers were erected cut and retained the hay grown on the station property as rent for the towers. Mr. Meredith testified in regard thereto the following:

Q. When did you discover [two towers were on another property]?

A. Sometime between -- It was sometime during when we were waiting on the approval from the FCC, which I think took thirty to ninety days. I can't remember exactly. We closed on June 11th, I think, June 10th or June 11th. So it was while I was actually in there operating the radio station.

    A situation came up where the radio station had grown up. They had let the land grow. And I had a dog, and I wanted to keep my dog down there, so I was going to mow the property. And Mr. Stair said not to, because the people that owned the land where the other towers were mowed it in exchange -- they took the hay in exchange for letting the towers stand up there. Which at that point it just scared me, because I had no idea what he was talking about. He explained that someone else owned the property where the other towers stood and that they mowed the hay in exchange for letting the towers stand there. That's when I called you.

Q. What did you do after that?

A. I called you and told you that I bought a radio station with towers on somebody else's land and I didn't know what to do.

Q. What did you do after that point in terms of trying to investigate what obligation the radio station had to those land owners?

A. At first I was going to try to call Ms. Hendrickson, but I had been gone for seven years. I was afraid I would be seen coming back into town as an outsider and coming back from Phoenix. And Mr. Stair had an ongoing relationship, had known the Hendricksons for years, and I asked if he would take care of it, which he said he would. Even at one point he came back and he said they would come up and mow it, but a tractor part was broken. So I asked [Mr. Stair] if he would speak to them for me.

However, by letter dated March 19, 1992, an attorney representing Ms. Hendrickson advised Clinton Broadcasters, Inc., that Ramax Corporation,[3] predecessor owner of the radio station, had a lease[4] with Ms. Hendrickson allowing it to place two radio towers on her property and sought $11,000 in rental arrearage through March 1992. The letter also suggested that upon payment of the $11,000 Ms. Hendrickson would be amenable to negotiating another lease on the property. Thereafter, in a response to a letter from the attorney representing Mr. Meredith, Ms. Hendrickson's attorney by letter dated May 22, 1992, advised that she would, until July 1, 1992, allow the station to remove the towers or to negotiate a new lease.

Upon being advised regarding rental arrearage and the $500 per month rent suggested, Mr. Meredith contacted Mr. Stair who agreed to try to work the matter out with Ms. Hendrickson, whom he had known for a number of years. Mr. Stair was, however, unable to contact Ms. Hendrickson

---

[3] Ramax went through a bankruptcy proceeding and Mr. Stair and two others purchased the radio station from the Trustee in Bankruptcy. Presumably, although it is not shown in the record, Mr. Stair purchased the interest of the other two and then owned 100 percent of the radio station.

[4] No lease was recorded nor entered at trial. It is, of course, possible that the lease was an oral one. With regard to this point, Mr. Stair insists that the statements in the letters from the attorney representing Ms. Hendrickson regarding the lease are hearsay and were excluded by the Trial Judge. They were admitted, as we understand it, for the purpose of showing a claim was being made. We also note, however, the testimony by deposition of Herbert M. Bacon, an attorney who was employed to foreclose a trust deed securing an indebtedness owed Mr. Stair and two of his associates by a former owner of the station. Mr. Bacon testified that there was a lease and that it was discussed with Mr. Stair and one of the former owners, vis-a-vis, the property upon which the towers sat. On this occasion Mr. Bacon advised that they would need to determine whether the lease had expired and if so whether it was extended under the same terms. Finally, we note as to this point that--whether there was a lease or not--Mr. Meredith was onerated with the burden of paying rent or removing the towers.

and finally quit trying. He thereupon told Mr. Meredith, according to Mr. Meredith's testimony, "that I had purchased the radio station too inexpensively" and washed his hands of the matter.

Because Mr. Meredith had exhausted his personal funds, as well as his credit with lending institutions he determined that it was best to tear down the towers.

Mr. Meredith testified that after he learned the towers were on other property he began making calls to Mr. Stair, perhaps as many as 160, in an attempt to resolve the problem. Mr. Stair denied receiving any calls after the problem came to light in March 1992, although long distance telephone bills introduced by Mr. Meredith contradict Mr. Stair's testimony.

Mr. Stair testified that Mr. Meredith was told that the towers were on Ms. Hendrickson's property at the December 1990 meeting and again some two or three days after the contract to sell was executed in April 1991. He denied telling Mr. Meredith that the hay harvested on the station property by Ms. Hendrickson was in lieu of rent for the towers.

Mr. Meredith's version of his conversation with Mr. Stair relative to the hay-for-rent swap is confirmed in part by both a present employee of the radio station and one of Mr. Stair's present business partners.

Mr. Stair also testified that there is a fence between the towers and the radio station property which he pointed out to Mr. Meredith on the December 1990 visit.

Mr. Stair further insists that Mr. Meredith had available to him the description of the 5.285-acre tract owned by the station as shown by a warranty deed from a previous owner to another previous owner found in the application filed with the FCC. It does not appear the description was available to Mr. Meredith on the visit to the premises in December 1990, nor is there any proof that he saw it prior to his signing his stock purchase agreement. Moreover, our reading of this deed persuades us it would take a surveyor with a transit and measuring instrument to determine the boundaries of the tract and whether the towers in question were in fact on other property.

After the towers were removed Mr. Meredith sought to obtain a permit from FCC, reducing his night-time wattage from 500 to 250 watts. His application, however, was denied and he was required by the FCC to reduce the wattage to 88, resulting in loss of advertising which he described as follows:

> Q. How did you come to the decision to simply remove the towers?
>
> A. I was the president of Clinton Broadcasters, Inc., which I was told that basically this liability was mine, even though I wasn't there. I didn't have the $11,000. The radio station couldn't afford $500 more per month every month for the rest of its life or however long they deemed me allowed to keep those towers there.

-4-

It was a business decision. It was the only option I felt that we had, a one time fee to rebuild the station and never have to do it again. I was able to borrow money on equipment, whereas I wasn't able to borrow money on a lease that may go up and may not go up and pay expenses that weren't mine.

Q. What effect did the removal of the towers have on the operation of the radio station?

A. Anybody that tries to listen to Clinton football at night will tell you that we have a terrible signal. It's because we went from 500 watts at night to 88 watts at night.[4] It diminished our broadcasting capability. It cut our listening area substantially. Just a reduction of power.

The clauses of the contract to purchase which Mr. Meredith asserts were breached are the following:

## ARTICLE III.

**3.05 Financial Statements.** The Seller has delivered to the Purchaser copies of the following financial statements, all of which are true and complete and have been prepared in accordance with generally accepted accounting principles consistently followed throughout the period indicated: (i) a balance sheet of the Company as of March, 1991 which presents a true and complete statement, as of its date, of the Company's financial condition and of its assets and liabilities; and (ii) statements of the Company's profit and loss accounts (including, without limitation, all taxable income of every nature), and of its surplus for the calendar years1990, which accurately presents the results of the Company's operations for the period indicated. Since the date of such financial statements, there has been no material adverse change in the financial condition of the Company.

**3.06. Liabilities.** Except to the extent reflected in the Company's balance sheet, the Company as of the date of the balance sheet had no liabilities of any nature, whether accrued, absolute, contingent, or otherwise. The Seller represents and warrants that he does not know or have reasonable grounds to know of any basis for the assertion against the Company of any liability of any nature or in any amount not fully reflected in said balance sheet.

. . . .

---

[4]    The listening area for daytime broadcasting was not affected by the removal of the towers.

**3.11. Contracts.** Attached hereto and made a part hereof as Exhibit C is a schedule of all leases, employment contracts, advertising contracts, informal arrangements, and other executory obligations of the Company to date, and the Company will not incur any new executory obligations, without the approval of the Purchaser, between the date hereof and the closing.

**3.14. Default.** The Company is not in default under, or in violation of, any provision of its Certificate of Incorporation or By-laws, any indenture, mortgage, debt, promissory note, contract, lease, agreement or other instrument to which it is a party, or by which it or its properties may be bound or affected; and no event has occurred or is continuing.

. . . .

## ARTICLE XIII
## INDEMNIFICATION AND RISK OF LOSS

**13.01 Indemnification.** The Seller agrees to and shall indemnify the Purchaser, his successors and assigns, against any and all damages resulting from any breach of any representation, warranty, or agreement set forth in this Agreement, or the untruth or inaccuracy thereof, including but not limited to all statements or figures contained in any of the exhibits to this Agreement. The Seller further agrees to and shall indemnify the Purchase against any and all debts, liabilities, or claims of any nature, absolute or contingent, together with all expenses and legal fees resulting from any such breach, untruth, or inaccuracy, or which may be incurred to compromise or defend such liabilities, or claims of any nature, absolute or contingent, including but not limited to any and all liabilities for federal income or excise taxes, or state or municipal taxes of any nature. This indemnity shall survive the Closing but shall be limited to liabilities of which the Seller shall receive notice in writing from the Purchaser or his successors or assigns within ten (10) years from the date of the Closing of this transaction. The Purchaser, his successors and assigns, shall notify the Seller of any such liability, asserted liability, breach of warranty, untruth or inaccuracy of representation, or any claim thereof, with reasonable promptness, and the Seller or their legal representative shall have, at their election, the right to compromise or defend any such matter involving asserted liability of the Seller through counsel of his own choosing, at the expense of the Seller. Such notice and opportunity to compromise or defend, if applicable, shall be a condition precedent to any liability of the Seller under this indemnity. In the event that the Seller undertakes to compromise or defend any such liability, he shall notify the Purchaser, or his successors or assigns, in writing promptly of their intention to do so and the Purchaser, his successors or assigns, agrees to cooperate with the Seller and his counsel in the compromising of or the defending against any such liabilities.

If requested by the Purchaser, the Seller shall deliver to the Purchaser, at the Closing, an Agreement of Indemnity, in form satisfactory to the Purchaser's counsel, to the effect set forth in this paragraph.

**13.02 Risk of Loss.** The Company will keep all of its real property equipment and other assets fully insured against any loss, either by fire, other casualty or theft. In the event that prior to the Closing Date such property is totally or substantially damaged by reason of fire or other casualty, or its loss by reason of theft, the Purchaser may, in the exercise of his sole discretion, terminate the within transaction, and all parties hereto shall be released from any further liability hereunder. If the Purchaser elects to consummate this transaction despite such damage or loss, it shall receive the proceeds of any insurance paid by reason of such damage or loss.

In addition, an addendum to the contract which was signed shortly after the transfer on June 10, 1991, contained the following provisions:

### ARTICLE XVII
### ALLOCATION AND ASSUMPTION OF LIABILITIES OF (CBI)

**17.01. Assumption of Liabilities by Seller.** Seller expressly assumes all liabilities, of any and all nature, of Clinton Broadcasters, Inc., owed and incurred by said corporation on or before June 1, 1991, and any liabilities for which corporate assets are serving as security whether presently existing or arising out of any act or failure to act by Clinton Broadcasters, Inc., its officers, directors, or agents, on or before June 1, 1991.

**17.02. Indemnification.** Seller expressly indemnifies the Purchasers and Clinton Broadcasters, Inc. against any loss, including attorney's fees, incurred as a result of any liability set forth in section 17.01 and agrees to hold the Purchasers and Clinton Broadcasters, Inc., harmless from any such liabilities, including reasonable attorneys fees.

As this is a non-jury case, our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct. Tenn.R.App.P. 13(d). We must honor that presumption unless we find that the evidence preponderates against the trial court's factual findings. Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are not accorded the same deference. Campbell v. Florida Steel Corp., 919 S.W.2d 26, 35 (Tenn. 1996).

It is apparent the Trial Court accredited the testimony of Mr. Meredith and discredited that of Mr. Stair. It has been repeatedly held by our appellate courts that the trial court having seen and

heard witnesses testify is in the best position to determine their credibility. Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164 (Tenn. 2002).

Our review of the record persuades us that the evidence preponderates in favor of the Trial Court's determination as to breach of contract.

Although not raised in the issue section of Mr. Stair's brief, in the argument section he raises several other issues, which we will now address:

1. Newly-Discovered Evidence:

As to the newly-discovered evidence feature of Mr. Stair's contentions, it does not appear that the denominated newly-discovered evidence meets the requirements set out in Seay v. City of Knoxville, 654 S.W.2d 397 (Tenn. Ct. App. 1983), to make it admissible in that the information Mr. Stair sought to have considered was available to him at the time of trial.[5]

1. Set-Off:

Mr. Stair contends that he is entitled to a set-off for the balance owing on a note in the original amount of $25,000 which was a part payment of the purchase price. This point was not raised either in his answer or his motion for a new trial, and because it was presented for the first time on appeal will not be considered. Civil Service Merit Board v. Burson, 816 S.W.2d 725 (Tenn. 1991).

3. Excessive Damages:

Given the actual out-of-pocket expenses incurred by Mr. Meredith and loss of revenues emanating from the removal of the two towers in question, we, as did the Trial Judge, find that his award of damages was supported by the proof in the record, which is as follows:

| | | |
|---|---|---|
| 1. Application and re-permitting fees to the FCC (total) | $ 2,280.00 |
| 2. Fees for engineering services to Mitch Sandidge (total) | $13,025.00 |
| 3. Equipment/parts purchased from Shields Electronic | $361.02 |
| 4. Used equipment purchased from radio station WQBB | $ 6,250.00 |

---

[5] "Another principle of law that is deeply ingrained in the holdings of our courts and has been repeated in the majority of the some 65 cases where our courts have addressed this issue is that to justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable diligence." 654 S.W.2d at page 399.

5.  Equipment/parts purchased from Richard Electronic        $410.40

TOTAL:    $22,326.42

As a result of having to reduce the power in the evening the station lost advertising revenues which, as shown by tax returns, reduced income in 1992 and 1993 by approximately $32,000 and in 1994 and 1995 by approximately $39,000.[6]

In conclusion, we have not overlooked Mr. Stair's argument that the Plaintiffs never paid one cent of rent to Ms. Hendrickson. They were, however, faced with the dilemma of having to remove the towers or pay the $11,000 rent arrearage and obligate themselves to pay additional rent indefinitely.[7]

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for collection of the judgment and costs below. Costs of appeal are adjudged against James F. Stair and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

---

[6]     The expenses actually incurred and the loss of income totaled $84,326.42, almost precisely the amount awarded by the Trial Court.

[7]     It does not appear that Ms. Hendrickson pressed her claim for rents in arrears after the towers were removed.